

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JANELLE JANSEN,<br><br>Plaintiff,<br><br>vs.<br><br>THE LINCOLN FINANCIAL GROUP,<br>THE LINCOLN NATIONAL LIFE<br>INSURANCE COMPANY, GROUP<br>LONG TERM DISABILITY INSURANCE<br>FOR THE EMPLOYEES OF THE<br>MINUTE CLINIC GROUP OF<br>EMPLOYERS, THE MINUTE CLINIC<br>GROUP OF EMPLOYERS,<br><br>Defendants. | 4:13-CV-04068-RAL<br><br><br>OPINION AND ORDER DENYING<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND<br>GRANTING DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT |

Plaintiff Janelle Jansen filed suit under 29 U.S.C. § 1132(a)(1)(B) claiming that Defendants improperly denied her benefits under a long-term disability plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461.[1] Doc. 11-1. The parties filed cross-motions for summary judgment on whether Jansen met the insurance plan's definition of "Totally Disabled" and was therefore entitled to benefits. For the reasons explained below, this Court denies Jansen's motion and grants the Defendants' motion.

## I. FACTS

This Court draws the facts from the administrative record and the portions of the statements of material facts that are either undisputed or not subject to genuine dispute. This dispute arises out of Jansen's claim of disability under the ERISA-governed plan of her former employer the Minute Clinic.

---

[1]This Court has interpreted Jansen's Second Amended Complaint as asserting only an ERISA claim. Doc. 15 at 6.

The Minute Clinic offers employees long-term disability insurance through its benefit plan (the Plan). Doc. 28 at ¶ 2; Doc. 31 at ¶ 1; Doc. 24-2 at ¶ 1; Doc. 37 at ¶ 1. The Lincoln National Life Insurance Company (Lincoln) insures and administers the Plan and has discretionary authority to construe the terms of the Plan and make eligibility determinations. Doc. 28 at ¶¶ 2, 6; Doc. 31 at ¶¶ 1, 3; Doc. 24-2 at ¶ 2; Doc. 37 at ¶ 2; Doc. 28-2 at 64. The Plan provided for long-term disability benefits if an insured was "Totally Disabled" as defined by the Plan, under the regular care of a physician, and submitted proof of disability to Lincoln upon request. Doc. 28-2 at 71. The Plan has two different definitions of "Totally Disabled" or "Total Disability" depending on the time frame for which benefits are sought. The first definition applies during the "Own Occupation Period," which begins after the initial ninety-day elimination period and lasts through the following twenty-four months. Doc. 28 at ¶ 3; Doc. 31 at ¶ 1; Doc. 28-2 at 54, 71. During the Own Occupation Period, Totally Disabled "means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation." Doc. 28 at ¶ 3; Doc. 31 at ¶ 1; Doc. 28-2 at 71. Once the Own Occupation Period expires, a second, more restrictive definition of Totally Disabled kicks in: "it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow." Doc. 28 at ¶ 3; Doc. 31 at ¶ 1; Doc. 28-2 at 71.

The Plan also contains a "Specified Injuries or Sicknesses Limitation," which states:

> If an Insured Employee is Disabled primarily due to one or more of the Specified Injuries or Sicknesses defined below; then Partial or Total Disability Monthly Benefits:
> 1. will be payable subject to the terms of this Policy; but
> 2. will be limited to 24 months for any one period of Disability; unless the Insured Employee is confined to a Hospital.

2

> "Specified Injuries or Sicknesses" include any Mental Sickness, or Substance Abuse, as defined below.

Doc. 28 at ¶ 4; Doc. 31 at ¶ 2; Doc. 28-2 at 77. The Plan defines "Mental Sickness" as:

> any emotional, behavioral, psychological, personality, adjustment, mood or stress-related abnormality, disorder, disturbance dysfunction or syndrome; regardless of its cause. It includes, but is not limited to:
>
> 1.    schizophrenia or schizoaffective disorder;
>
> 2.    bipolar affective disorder, manic depression, or other psychosis; and
>
> 3.    obsessive-compulsive, depressive, panic or anxiety disorders.
>
> These conditions are usually treated by a psychiatrist, a clinical psychologist or other qualified mental health care provider. Treatment usually involves psychotherapy, psychotropic drugs or similar methods of treatment.

Doc. 28 at ¶ 4; Doc. 31 at ¶ 2; Doc. 28-2 at 77.

Jansen was a nurse practitioner for the Minute Clinic in Minnesota until October 27, 2009, when, at age fifty-four, she stopped working because of non-ischemic congestive heart failure.[2] Doc. 28 at ¶¶ 2, 7; Doc. 31 at ¶¶ 1, 3; Doc. 24-2 at ¶ 2; Doc. 37 at ¶ 2. An echocardiogram performed that day showed that Jansen's ejection fraction[3] was below normal at

---

[2]"Congestive heart failure occurs when the heart can't pump enough blood to provide what the body demands, resulting in a reduction in blood flow to the body and a backup (congestion) of blood into the lungs." Conditions We Treat: Congestive Heart Failure, Johns Hopkins Med., http://www.hopkinsmedicine.org/heart_vascular_institute/conditions_treatments/conditions/cong estive_heart_failure.html (last visited Aug. 3, 2015). Non-ischemic congestive heart failure "is heart failure that is unrelated to coronary artery disease and therefore has nothing to do with a poor coronary artery blood supply." Non-ischemic Congestive Heart Failure Treatment with Stem Cell Therapy, http://www.stemcellmx.com/treatable-conditions/stem-cell-treatment-for-heart-conditions/non-ischemic-congestive-heart-failure-treatment-with-stem-cell-therapy/ (last visited Aug. 3, 2015).

[3]The ejection fraction is an important measurement of heart function. A normal ejection fraction may be between fifty-five and seventy, while a measurement below forty may be evidence of heart failure or cardiomyopathy. Ejection Fraction Heart Failure Measurement, Am. Heart Ass'n, http://www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeartFaliure/

thirty percent. Doc. 28-4 at 224. Doctors treated Jansen with heart medications and the placement of a biventricular implantable cardioverter-defibrillator (ICD), a device used to control cardiac arrhythmias.[4] Doc. 28-4 at 219, 221, 223. Thereafter, Jansen submitted a claim for long-term disability benefits with Lincoln. Doc. 28-4 at 194. Lincoln determined that Jansen was unable to perform the main duties of her occupation as a nurse practitioner and awarded her long-term disability benefits effective January 26, 2010. Doc. 28 at ¶ 8; Doc. 31 at ¶ 3; Doc. 24-2 at ¶ 3; Doc. 37 at ¶ 3; Doc. 28-4 at 194–196.

Over the following year and a half, Jansen treated with internist Dr. Donald Somers, cardiologist Dr. Luis Pagan-Carlo, and psychiatrist Dr. Molly Silas. At a March 2010 appointment with Dr. Pagan-Carlo, Jansen reported feeling "pretty well" overall but still having some fatigue. Doc. 28-3 at 344. Dr. Pagan-Carlo remarked in his notes that Jansen walked around the unit with him "at a relatively rapid pace" without experiencing shortness of breath or being unable to talk. Doc. 28-3 at 345. Jansen's ejection fraction had increased to fifty percent and Dr. Pagan-Carlo believed that she was "doing well." Doc. 28-3 at 345. According to Dr. Somers's notes from an April 2010 appointment, Jansen was "making very slow but steady progress." Doc. 28-4 at 160. On May 13, 2010, Dr. Pagan-Carlo completed an attending physician's statement form from Lincoln. Doc. 28-4 at 146–48. He identified Jansen's work capacity as "medium," which meant that she could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, and typically be on her feet a minimum of six hours out of an eight-hour workday. Doc. 28-4 at 148. He also marked on the form that Jansen was not totally

---

Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp (last updated June 1, 2015).

[4]Implantable cardioverter-defibrillators (ICDs), Mayo Clinic, http://www.mayoclinic.org/tests-procedures/implantable-cardioverter-defibrillator/basics/definition/prc-20015079 (July 16, 2015).

disabled from her job or any other job and that she could return to work part time at five hours a day. Doc. 28-4 at 147.

At Dr. Somers's suggestion, Jansen began seeing Dr. Silas for psychiatric treatment. Doc. 28-3 at 306. Jansen had a history of psychiatric issues, having previously been diagnosed with depression and bipolar II disorder.[5] Doc. 28-2 at 408, 441; Doc. 28-3 at 11. Her past treatment for these conditions included electroconvulsive therapy, Doc. 28-2 at 419–28, three voluntary hospitalizations in 2004, Doc. 28-2 at 407–11, 434–37; Doc. 28-3 at 9–16, and psychotropic medications, Doc. 28-3 at 12, 81–83, 87–120. When Jansen saw Dr. Silas for an initial evaluation on May 21, 2010, she was not depressed or manic, and Dr. Silas rated her concentration as good. Doc. 28-3 at 306. Dr. Silas concurred with the prior diagnosis of bipolar II disorder and adjusted Jansen's psychotropic medications. Doc. 28-3 at 304–309. After seeing Jansen on May 27, 2010, Dr. Pagan-Carlo wrote that he had trouble communicating with her and opined that she may have been "in a bipolar crisis." Doc. 28-3 at 343.

Jansen visited Dr. Silas again on June 23, 2010. Doc. 28-3 at 302. Jansen reported doing well, with fewer symptoms of depression. Doc. 28-3 at 302. Dr. Silas noted that Jansen's thought process, memory, affect, judgment, insight, and speech were normal and assessed Jansen as doing "significantly better" on the adjusted medication regimen. Doc. 28-3 at 302. Although Jansen exhibited an impaired affect and appearance and had thoughts of suicide when she saw

---

[5]Bipolar disorder "causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression)." Bipolar disorder, Mayo Clinic (Feb. 10, 2015), http://www.mayoclinic.org/diseases-conditions/bipolar-disorders/basics/con-20027544. Bipolar II disorder is a specific type of bipolar disorder which is characterized by "at least one major depressive episode lasting at least two weeks and at least one hypomanic episode lasting at least four days." Bipolar disorder, Mayo Clinic (Feb. 10, 2015), http://www.mayoclinic.org/diseases-conditions/bipolar-disorders/basics/symptoms/con-20027544. "Most people with bipolar II disorder suffer more often from episodes of depression." Bipolar II Disorder, WebMD, http://www.webmd.com/bipolar-disorder/guide/bipolar-2-disorder (last visited Aug. 3, 2015).

5

Dr. Silas in June and September of 2010, other aspects of her mental function, including her speech, insight, memory, judgment, and orientation, remained normal. Doc. 28-3 at 300–01.

In early October 2010, Jansen learned that the Social Security Administration had determined that she became disabled under the Administration's rules as of September 10, 2010. Doc. 28-4 at 33. Jansen saw Dr. Silas for a follow up on October 8, 2010, during which Jansen reported that she had enjoyed a recent trip to Italy and that she was getting "a little bit better." Doc. 28-3 at 298. Dr. Silas noted that Jansen was negative for suicidal ideation and that her mental function appeared normal. Doc. 28-3 at 298. She assessed Jansen as having bipolar II disorder and anxiety disorder but as doing "fairly well." Doc. 28-3 at 298. Jansen saw Dr. Pagan-Carlo five days later. Doc. 28-3 at 338. She complained of occasional chest and back pain and said that although she had traveled to Italy, she got more tired than she thought appropriate. Doc. 28-3 at 338. Given Jansen's history and complaints of chest pain, Dr. Pagan-Carlo ordered a nuclear stress test,[6] Doc. 28-3 at 339, which came back normal, Doc. 28-3 at 336.

Jansen reported worsening depression, low energy, and poor concentration when she saw Dr. Silas in December 2010. Doc. 28-3 at 296. She told Dr. Silas of a week-and-a-half period when she did not get out of bed or shower. Doc. 28-3 at 296. Dr. Silas noted that Jansen was negative for suicidal ideation and that her mental function was normal. Doc. 28-3 at 296. She assessed Jansen as having an increase in depression and adjusted her medication. Doc. 28-3 at 296. Jansen's mood was better when she visited Dr. Silas the next month. Doc. 28-3 at 295. Dr.

---

[6] "A nuclear stress test measures blood flow to [the] heart at rest and while [the] heart is working harder as a result of exertion or medication. The test provides images that can show areas of low blood flow through the heart and damaged heart muscle." Nuclear stress test, Mayo Clinic (Dec. 6, 2014), http://www.mayoclinic.org/tests-procedures/nuclear-stress-test/basics/definition/prc-20012978.

6

Silas recorded that although Jansen's appearance and affect were impaired, the remaining aspects of her mental function were normal. Doc. 28-3 at 295.

On February 4, 2011, Jansen saw Dr. Pagan-Carlo's physician's assistant (PA), complaining of an increase in chest and back discomfort. Doc. 28-3 at 334. The PA noted that Jansen had "just recently returned from a trip to Key West where she was quite active doing parasailing, jet skiing, snorkeling, etc. and was pretty much on the go the whole time she was there." Doc. 28-3 at 334. Jansen reported that she had experienced a dramatic decrease in energy and some exertional shortness of breath since her return. Doc. 28-3 at 334. Unsure of the etiology of Jansen's symptoms, the PA ordered a stress test. Doc. 28-3 at 336. The test was normal and showed that Jansen's ejection fraction was sixty-three percent. Doc. 28-3 at 351–52. After seeing Jansen on February 23, 2011, Dr. Silas diagnosed her as having bipolar II disorder, anxiety disorder, and posttraumatic stress disorder.[7] Doc. 28-3 at 294. She recorded that Jansen's affect was impaired and that she was having suicidal thoughts, but that other aspects of Jansen's mental function were normal. Doc. 28-3 at 294.

Dr. Silas completed an attending physician's statement form from Lincoln on April 1, 2011. Doc. 28-3 at 408–09. She identified Jansen as having a class three mental impairment, which meant that Jansen was able to engage in only limited stress situations and interpersonal relationships. Doc. 28-3 at 408. When asked on the form whether Jansen was totally disabled from her job and any other work, Dr. Silas checked "yes" and wrote "cardiac related." Doc. 28-3 at 409. She marked that Jansen's disability would not improve in the future. Doc. 28-3 at 409. At a followup with Dr. Pagan-Carlo's PA later that month, Jansen reported exertional nausea and fatigue along with pain in her shoulder blades. Doc. 28-3 at 330. The PA remained uncertain

---

[7]Dr. Silas's notes from this appointment did not elaborate on the diagnosis of posttraumatic stress disorder.

7

about the etiology of Jansen's shoulder pain but felt that Jansen's two normal stress tests within the last six months made it unlikely that ischemia[8] was the cause. Doc. 28-3 at 332.

Jansen moved from Minnesota to Sioux Falls, South Dakota in July 2011 to be closer to her family. Doc. 28-3 at 255. She began treating with psychiatrist Dr. William Fuller, internist Dr. Richard Nelson, and cardiologist Dr. Bruce Watt. Jansen's first appointment in Sioux Falls was on July 7, 2011, with Dr. Fuller. Doc. 28-3 at 255. She reported having four depressive swings since January 2011, during which she had increased anxiety, low energy, and difficulty meeting her responsibilities. Doc. 28-3 at 255. A mental status examination that day was normal, with Jansen displaying a logical thought process and good concentration and focus. Doc. 28-3 at 256. Dr. Fuller, who had treated Jansen for a "fairly lengthy period of time" in the past, wrote that her "history of bipolar illness is very well documented. I have seen her personally in all phases of her illness and there is no question that she has bipolar disorder." Doc. 28-3 at 255–56. He continued Jansen on her psychotropic medication regimen. Doc. 28-3 at 256.

Jansen saw Dr. Nelson for an initial appointment the following day. Doc. 28-3 at 241–43. She reported having traveled "quite a bit to Peru and to Africa" but also that she tired easily if she overdid it. Doc. 28-3 at 241–42. She returned to Dr. Nelson just four days later, complaining of shortness of breath and swelling of her legs. Doc. 28-3 at 239–40. According to Dr. Nelson's notes, it was "a very hot and humid day and [Jansen] ha[d] been working very hard" when she experienced the swelling. Doc. 28-3 at 240. He concluded that Jansen was stable and continued her on her heart medications. Doc. 28-3 at 239.

---

[8]"Myocardial ischemia occurs when blood flow to [the] heart is reduced, preventing it from receiving enough oxygen." Myocardial ischemia, Mayo Clinic (July 25, 2015) http://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/basics/definition/con-20035096.

8

When Jansen returned to Dr. Fuller on August 18, 2011, she stated that she was doing "quite well" overall but that she had been experiencing some depression. Doc. 28-3 at 253. A mental exam showed that Jansen had a mildly depressed mood punctuated by episodes of laughing, joking, and higher energy bursts. Doc. 28-3 at 253. Her thought process, thought content, and mental grasp and capacity were all normal, however. Doc. 28-3 at 253. Dr. Fuller adjusted her psychotropic medications and requested that she return in six weeks for a followup. Doc. 28-3 at 254. Jansen had an appointment with Dr. Watt on August 23, 2011, during which her main complaint was fatigue. Doc. 28-3 at 130–32. Dr. Watt's takeaway from the appointment was that "[a]t this point overall [Jansen] is clinically stable from her cardiomyopathy standpoint. In fact, she had complete recovery of her function going from an ejection fraction of 28% to normal LV function on the recent Mayo Clinic evaluation." Doc. 28-3 at 132. He further opined that there was "a high likelihood that [Jansen's] fatigue is related to depression and lifestyle changes and not all physiologic." Doc. 28-3 at 132.

Jansen saw Dr. Watt again in September 2011, reporting shortness of breath and fatigue. Doc. 28-3 at 135. Dr. Watt's impression from this appointment was that there was a question of "some mild exacerbation of dyspnea[9] with fluid overload improved with increased diuretic therapy." Doc. 28-3 at 136. At Dr. Watt's suggestion, Jansen saw cardiologist Dr. Paul Olson on October 3, 2011. Doc. 28-3 at 126–129. Dr. Olson evaluated Jansen's ICD, which revealed an increased OptiVol fluid index in early to mid-July through mid-September.[10] Doc. 28-3 at

---

[9]Dyspnea means shortness of breath. Definition of Dyspnea, MedicineNet.com, http://www.medicinenet.com/script/main/art.asp?articlekey=3145 (Mar. 19, 2012).

[10]Some ICDs have OptiVol technology, which allows doctors to monitor a patient's intrathoracic impedance. Martin R. Cowie, Monitoring Heart Failure Using An Implantable Device Measuring Intrathoracic Impedance-Technical And Clinical Overview, Radcliffe Cardiology, http://www.radcliffecardiology.com/articles/monitoring-heart-failure-using-implantable-device-measuring-intrathoracic-impedance (last visited Aug. 3, 2015). "Intrathoracic impedance falls as

9

128. Due to the increased OptiVol fluid index, he recommended an adjustment of Jansen's heart medications and that she have ICD checks performed regularly. Doc. 28-3 at 128–29.

Jansen saw Dr. Nelson on December 13, 2011, for a routine visit, during which he completed an attending physician's statement form from Lincoln. Doc. 28-3 at 215–221, 271. Dr. Nelson recorded on the form that Jansen was totally disabled from her job and any other job, and that Jansen's disability would never improve. Doc. 28-3 at 272. He wrote "Pt has Ejection Fraction 28%" under the "Restrictions and Limitations" section of the form. Doc. 28-3 at 272.

On December 26, 2011, Jansen was admitted through an emergency room for chest pain and shortness of breath. Doc. 28-3 at 147. A CT scan of Jansen's chest showed no evidence of a pulmonary embolism. Doc. 28-3 at 153. An emergency room doctor assessed Jansen as having atypical chest pain and shortness of breath with an uncertain etiology and instructed her to follow up with Dr. Olson. Doc. 28-3 at 149. Jansen returned to the emergency room the following day, complaining this time of shortness of breath and right arm pain. Doc. 28-3 at 159. Jansen's arm pain nearly resolved while resting in the emergency room, following which she was discharged with instructions to follow up with her cardiologist. Doc. 28-3 at 162.

Dr. Fuller completed an attending physician's statement form from Lincoln on January 3, 2012. Doc. 28-3 at 249–50. He listed bipolar disorder, anxiety disorder, cardiomyopathy, and congestive heart failure as Jansen's diagnoses. Doc. 28-3 at 249. He checked that Jansen had a class four physical impairment, which meant that she was incapable of even sedentary activity; a class four mental impairment, meaning that she was unable to engage in stress situations or

---

the amount of fluid in the lungs increases, due to fluid being a good conductor of electrical current . . . . The OptiVol Fluid Index represents the accumulation of consecutive day-to-day differences between the daily and reference impedance. In other words, as the lungs become wetter or stay wetter the index increases." Id.

interpersonal relations; marked limitations of her functional capacity; and a total disability from her job and any other work that would never improve. Doc. 28-3 at 249–50.

In February 2012, twenty-four months after Lincoln began paying Jansen long-term disability benefits, Lincoln notified Jansen that her claim would be reviewed under the newly applicable "any occupation" definition of Total Disability. Doc. 28 at ¶ 10; Doc. 31 at ¶ 3. In addition to requesting supportive information from Jansen, Lincoln engaged internist Dr. Gary Greenhood and psychiatrist Dr. Bettina Kilburn to review Jansen's file under the new definition and answer certain questions. Doc. 28 at ¶ 10; Doc. 31 at ¶ 3; Doc. 28-4 at 56–61. Dr. Greenhood concluded that Jansen's file did not support any restrictions or limitations "on the basis of a physical cause." Doc. 28-4 at 61. He noted that Jansen's ejection fraction had returned to normal by the summer of 2011 and stated that "[a]ccording to submitted medical information, there is no indication of dysfunction of the ICD, arrhythmia, angina pectoris, or congestive heart failure." Doc. 28-4 at 61. Dr. Kilburn reached a similar conclusion regarding Jansen's mental health, finding that the evidence did not support the degree of psychiatric limitation set forth in Dr. Fuller's January 3, 2012 attending physician's statement. Doc. 28-4 at 57. Although acknowledging that mood instability may cause Jansen some "episodic limitations" in her ability to engage in appropriate interpersonal relations, Dr. Kilburn noted what she believed to be a lack of evidence supporting more serious limitations, including that there was "no record of psychiatric treatment before 7/11/11,"[11] and that the mental status evaluations from Jansen's appointments with Dr. Fuller in July and August of 2011 were within normal limits. Doc. 28-4 at 57.

---

[11] It appears that records of the psychiatric treatment Jansen received before July 11, 2011, were not in Jansen's file at the time Dr. Kilburn reviewed it. Doc. 28-4 at 58.

11

Lincoln performed a vocational assessment of Jansen in late February 2012. Doc. 28-3 at 201–03. Based on Dr. Greenhood's conclusion that Jansen did not have any physical limitations, Lincoln conducted a transferable skills analysis at the sedentary to light physical requirement levels, as defined by the United States Department of Labor. Doc. 28-3 at 201. It concluded that Jansen was qualified for several jobs, all of which fell within the sedentary to light physical demand level and had a wage comparable to Jansen's original position, including nursing positions at a school or office, nurse consulting, and nurse registry management. Doc 28 at ¶ 11; Doc. 31 at ¶ 4; Doc. 28-3 at 202–03. Lincoln did not take Jansen's psychiatric diagnoses into account when performing the vocational assessment. Doc. 28-3 at 201.

In mid-March 2012, Lincoln denied Jansen's claim for long-term disability benefits. Doc. 24-2 at ¶ 4; Doc. 37 at ¶ 4; Doc. 28-3 at 180–84. It explained in a letter that "based upon your age, education, training, past work experience and your current abilities, . . . you are not prevented from performing work in other occupations, even if you can no longer perform your Own Occupation. Therefore, you no longer meet the definition of disability in this policy and benefits will be denied as of 2/26/2012." Doc. 28-3 at 182.

Jansen saw internist Dr. Scott Hiltunen on April 25, 2012, for shortness of breath and nausea. Doc. 28-3 at 62–66. Dr. Hiltunen adjusted Jansen's cholesterol medication and prescribed her something for the nausea. Doc. 28-3 at 65–66. Jansen had an appointment with cardiologist Dr. Elden Rand five days later. Doc. 28-2 at 365–68. She reported experiencing spells of nausea and dizziness over the past two weeks. Doc. 28-2 at 365. Dr. Rand ordered several tests to determine the etiology of Jansen's symptoms, including an echocardiogram, Doc. 28-2 at 367–68, which came back normal, Doc. 28-2 at 211, 219.

In early May 2012, Jansen appealed Lincoln's denial of her long-term disability benefits claim. Doc. 28-3 at 178. She submitted additional medical records and explained in a letter that her heart and mental health problems caused her significant limitations. Doc. 28-3 at 178. Jansen returned to Dr. Hiltunen on May 7, 2012, complaining of nausea, fatigue, lack of energy, and shortness of breath. Doc. 28-3 at 59. Dr. Hiltunen adjusted Jansen's heart medication to address her lack of energy and fatigue. Doc. 28-3 at 61. Jansen reported feeling markedly better when she saw Dr. Rand four days later. Doc. 28-2 at 362. Although Jansen did not have a regular exercise program, she said that she remained quite active restoring antique furniture. Doc. 28-2 at 362. Dr. Rand ordered a stress test for Jansen, which came back normal. Doc. 28-2 at 180, 221–24.

Dr. Rand reevaluated Jansen on July 5, 2012. Doc. 28-2 at 209. His impression from the appointment was that Jansen's chest pain was complicated by a history of diagonal-branch vessel coronary artery disease and could also have an anxiety component. Doc. 28-2 at 211. He prescribed a trial of nitroglycerin. Doc. 28-2 at 211. Jansen reported worsening symptoms at a July 16, 2012 appointment with Dr. Olson. Doc. 28-2 at 213. She complained of an increased heart rate, palpitations, shortness of breath, and fatigue. Doc. 28-2 at 213–14. Dr. Olson recommended adjusting Jansen's heart medications. Doc. 28-2 at 215.

On July 18, 2012, cardiologist Dr. Darius Marhamati reviewed Jansen's file for Lincoln. Doc. 28-2 at 350–53. Lincoln had sought Dr. Marhamati's opinion concerning whether Jansen had restrictions and limitations that would prevent her from performing any sedentary occupation. Doc. 24-2 at ¶ 10; Doc. 37 at ¶ 10; Doc. 28-2 at 15, 120, 355, 360. As part of this inquiry, Lincoln asked Dr. Marhamati to 1) state his findings after reviewing Jansen's medical records; 2) provide a description of Jansen's impairments, if any, that were supported by the

13

medical records and to outline how these impairments would translate into functional limitations and/or medically appropriate restrictions; and 3) whether the restrictions or limitations placed upon Jansen by her attending physicians were reasonable and consistent with the medical findings. Doc. 28-2 at 15, 351–352. Dr. Marhamati concluded that Jansen's "cardiac status had improved as of 1/26/2012 forward. Her cardiomyopathy had resolved, as shown on multiple occasions with multiple non-invasive cardiac evaluations. There are no cardiac findings . . . that would have precluded the claimant from working sedentary occupation . . . ." Doc. 28-2 at 351.

Jansen saw Dr. Nelson in late July 2012 for a urinary tract infection. Doc. 28-2 at 242. He wrote that Jansen "gets quite a bit of exercise and is outdoors. She rides bicycle, walks her dog." Doc. 28-2 at 245. His assessment was that Jansen was doing "very well as far as cardiomyopathy goes," and that her depressive symptoms were "much improved." Doc. 28-2 at 245.

Lincoln denied Jansen's appeal in August 2012. Doc. 28-2 at 354–58. Relying mainly on Dr. Marhamati's opinion, Lincoln concluded that Jansen could work in a sedentary occupation appropriate for her skills and income history. Doc. 28 at ¶ 15; Doc. 31 at ¶ 5; Doc. 28-2 at 356. Lincoln's denial letter did not discuss Jansen's mental health issues. Doc. 28-2 at 354–58.

Jansen saw Dr. Fuller for a medication recheck on October 9, 2012. Doc. 28-2 at 172. A mental status examination showed that Jansen had a depressed and anxious mood, a slightly blunted affect, fair but diminished concentration and focus, and normal appearance, memory, and abstractive thinking. Doc. 28-2 at 173–74. Dr. Fuller's diagnostic impression was bipolar II disorder, with Jansen being "quite depressed" at the time, and anxiety disorder. Doc. 28-2 at

14

174. He directed Jansen to continue on her psychotropic medication regimen and to return in two months. Doc. 28-2 at 174.

Jansen appealed Lincoln's decision for a second and final time on October 17, 2012. Doc. 28-2 at 347–48. She argued that Lincoln had ignored her psychological issues and submitted additional medical records. Doc. 28-2 at 347–48. In connection with Jansen's final appeal, Lincoln had internist Dr. Mark Rosen and psychiatrist Dr. Chris Esguerra conduct medical reviews of Jansen's file in December 2012. Doc. 28-2 at 155–66. As with Dr. Marhamati, Lincoln asked Dr. Rosen and Dr. Esguerra whether Jansen had restrictions and limitations that would prevent her from performing any sedentary occupation. Doc. 24-2 at ¶ 10; Doc. 37 at ¶ 10; Doc. 28-2 at 12–15, 121, 123. As part of these inquiries, Lincoln asked Dr. Rosen and Dr. Esguerra essentially the same three questions it asked Dr. Marhamati. Doc. 28-2 at 12–15, 158–61, 165.

Dr. Rosen found that although Jansen once had a "significant cardiac impairment due to a cardiomyopathy," this problem had resolved, with Jansen now exhibiting a normal ejection fraction with "no significant structural heart disease." Doc. 28-2 at 165. He concluded that there was "no documentation of significant cardiac disease or pulmonary disease that would prevent this claimant from performing sedentary labor from 2/2/12 forward." Doc. 28-2 at 166. Dr. Esguerra reviewed Jansen's medical history, including the psychiatric treatment she received in 2004, her appointments with Dr. Silas, and her appointments with Dr. Fuller in July and August of 2011,[12] before concluding that were "no clear descriptions of symptoms that would support active psychiatric impairments" beyond February 26, 2012. Doc. 28-2 at 155–61. Accordingly,

---

[12]Dr. Esguerra did not review Jansen's October 2012 appointment with Dr. Fuller. The administrative record is unclear concerning when Jansen provided Lincoln with the record of the 2012 appointment and in turn, whether Lincoln ever provided Dr. Esguerra with this record.

Dr. Esguerra concluded that Jansen's diagnoses of bipolar II disorder and anxiety disorder did "not prohibit [Jansen] from performing a sedentary occupation." Doc. 28-2 at 161.

Jansen sent these medical reviews to her own doctors in early 2013. Doc. 28-2 at 150, 154. Dr. Hiltunen replied that he agreed with the medical review that "at this point there is no objective evidence to suggest [Jansen] would have a physical limitation that would preclude her from working." Doc. 28-2 at 136. He also explained, however, that given Jansen's "overall medical condition, including her psychiatric problems," he did not think she could work as a nurse practitioner: "I feel the day-to-day stress involved, the concentration required to make diagnostic and therapeutic decisions would not be adequate to perform that job function." Doc. 28-2 at 136. Dr. Fuller went even further, responding that when Jansen's bipolar disorder was symptomatic, she could not function in competitive employment of any type. Doc. 28-2 at 139–140. According to Dr. Fuller, "Bipolar Disorder is a lifelong illness characterized by episodes of severe symptoms and intervals with minimal symptoms." Doc. 28-2 at 139. He wrote that Jansen's hypo-manic episodes and depressive episodes had caused her to lose nearly every job she had, that her bipolar disorder had never been "even mostly controlled" despite receiving treatment reserved "for only the most difficult cases," and that she continued to cycle into manias and severe depressive episodes. Doc. 28-2 at 139–40. In Dr. Fuller's opinion, Jansen's level of impairment in early 2013 was actually greater than in 2004. Doc. 28-2 at 140.

In March 2013, Lincoln denied Jansen's final appeal for benefits beyond the Own Occupation Period which had ended on February 26, 2012. Lincoln concluded that Jansen's cardiac impairment had improved such that there was "no documentation of significant cardiac disease or pulmonary disease that would prevent [Jansen] from performing in a sedentary capacity," that there were "no records to indicate severity of psychiatric symptoms that would

16

adversely affect function during the time period in question," that she could work in a sedentary occupation as a nurse consultant or nurse registry director, and that these jobs were appropriate for her skills and income history. Doc. 28 at ¶ 15; Doc. 31 at ¶ 5; Doc. 28-2 at 119–27.

Thereafter, Jansen sued Lincoln in this Court, alleging that Lincoln improperly denied her benefits under the Plan. Doc. 1. Jansen's original complaint contained breach of contract and tort claims, but she later amended it to assert an ERISA claim. Docs. 15, 16. The parties filed cross-motions for summary judgment concerning whether Lincoln properly denied Jansen benefits under the Plan. Docs. 22, 24. Lincoln argued in its motion for summary judgment that the denial of benefits was not an abuse of discretion and was supported by substantial evidence. Doc. 28. Jansen argued in her motion for summary judgment that Lincoln had a conflict of interest and that it had abused its discretion by applying an incorrect standard when reviewing her claim for benefits. Doc. 24-1.

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B). In ruling on a motion for summary judgment, the facts and inferences

17

fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## B. Standard of Review for Denial of Benefits

ERISA allows a person denied benefits under an employee benefit plan to seek review of that denial in federal court. 29 U.S.C. § 1132(a)(1)(B). The parties agree that, because the Plan grants Lincoln discretionary authority to construe the Plan's provisions and make eligibility determinations, this Court must review Lincoln's denial of Jansen's claim for an abuse of discretion. Johnson v. United of Omaha Life Ins. Co., 775 F.3d 983, 986–87 (8th Cir. 2014); Doc. 28 at ¶ 6; Doc. 31 at ¶ 3; Doc. 24-1 at 3; Doc. 28-2 at 64. Under the abuse-of-discretion standard, this Court must uphold Lincoln's decision "so long as it is based on a reasonable interpretation of the Plan and is supported by substantial evidence." Hampton v. Reliance Standard Life Ins. Co., 769 F.3d 597, 600 (8th Cir. 2014). Substantial evidence means "more than a scintilla but less than a preponderance," Schatz v. Mut. of Omaha Ins. Co., 220 F.3d 944, 949 (8th Cir. 2000), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," King v. Hartford Life & Accident Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005) (en banc) (quoting Donaho v. FMC Corp., 74 F.3d 894, 900 & n.10 (8th Cir. 1996)). In Finley v. Special Agents Mutual Benefit Ass'n, 957 F.2d 617 (8th Cir. 1992), the Eighth Circuit articulated several factors to assess the reasonableness of administrators' interpretations of ERISA-governed plans, including:

> whether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language of the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue

18

> consistently, and whether their interpretation is contrary to the
> clear language of the Plan.

King, 414 F.3d at 999 (quoting Finley, 957 F.2d at 621). Still, although the factors in Finley "inform [this Court's] analysis . . . '[t]he dispositive principle remains . . . that where plan fiduciaries have offered a "reasonable interpretation" of disputed provisions, courts may not replace [it] with an interpretation of their own.'" Id. (second and third alterations in original) (quoting de Nobel v. Vitro Corp., 885 F.2d 1180, 1188 (4th Cir. 1989)).

When as here, the administrator has a conflict of interest because it both insures the plan and makes benefit determinations, courts still apply the abuse-of-discretion standard, but take the conflict of interest into account when doing so. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115–18 (2008) (explaining that a conflict of interest must "be weighed as a 'factor in determining whether there is an abuse of discretion'" (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989))). "A conflict of interest should be given greater weight 'where circumstances suggest a higher likelihood that it affected the benefits decision.'" Govrik v. Unum Life Ins. Co. of Am., 702 F.3d 1103, 1109 (8th Cir. 2013) (quoting Metro. Life, 554 U.S. at 117).

## C. Analysis

Jansen's arguments in support of her motion for summary judgment and against Lincoln's motion focus on the Plan's definition of Total Disability and the questions Lincoln asked the reviewing physicians. She contends that Lincoln violated the terms of the Plan by asking the reviewing doctors whether she could perform any sedentary occupation. According to Jansen, her "training, education or experience" qualified her to work as a nurse practitioner, and the Plan therefore required Lincoln to analyze whether she could perform the main duties of this occupation. At the very least, Jansen argues, Lincoln should have asked the reviewing

19

physicians whether she could perform the main duties of the positions Lincoln identified in the vocational assessment. Jansen asserts that Lincoln's failure to do so renders the reviewing doctor's opinions unreliable and that it was therefore an abuse of discretion to rely on those opinions. Finally, Jansen urges this Court to take Lincoln's conflict of interest into consideration when reviewing Lincoln's decision.

Lincoln, on the other hand, argues that it reasonably interpreted the Plan's definition of Totally Disabled, and that medical records, the opinions of the consulting physicians, and the vocational assessment provide substantial evidence supporting its decision to terminate Jansen's benefits. Lincoln also contends that even if it abused its discretion by concluding that Jansen's mental health did not render her Totally Disabled, the Plan's Specified Injuries or Sicknesses Limitation[13] precludes Jansen from receiving any further benefits.

After reviewing the administrative record and considering the parties' arguments, this Court concludes that, under the abuse of discretion standard, substantial evidence exists to support Lincoln's decision, and thus Lincoln is entitled to summary judgment. First, Lincoln's interpretation of the Plan's definition of Total Disability was reasonable under the factors set forth in Finley. As described above, the Plan provides two different definitions of Total Disability depending on the time frame for which benefits are sought:

> 1. During the Elimination Period and Own Occupation Period, [Total Disability] means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.
> 2. After the Own Occupation Period, [Total Disability] means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.

---

[13]Lincoln's denial letter quoted that language, but did not base denial of the claim on the Specified Injuries or Sickness Limitation. Doc. 28-2 at 119–27. Ultimately, this Court need not reach the question of whether Lincoln now can invoke that basis for denial.

Doc. 28 at ¶ 3; Doc. 31 at ¶ 1; Doc. 28-2 at 71. Jansen received benefits through the Own Occupation Period, which benefits ended on February 26, 2012. Jansen's claim for ongoing benefits comes after the Own Occupation Period. Thus, the determinative question is not whether Jansen could perform the main duties of a nurse practitioner, but whether she could perform the main duties of "any gainful occupation which . . . her training, education, or experience will reasonably allow," which is the "any occupation standard." Jansen's argument to the contrary not only ignores the plain language of the any occupation standard, but also renders the standard superfluous. That is, under Jansen's interpretation, the term Totally Disabled would have the same meaning under both the Own Occupation standard and the any occupation standard. Beyond this, Jansen has failed to offer any evidence or argument that Lincoln's interpretation is inconsistent with a prior interpretation, the goals and terms of the Plan,[14] or the requirements of ERISA. See Finley, 957 F.2d at 621.

Next, Lincoln's failure to ask Dr. Marhamati, Dr. Rosen, and Dr. Esguerra whether Jansen could perform the main duties of the positions identified in the vocational assessment did not render the reviewing doctors' opinions irrelevant or altogether unreliable. Under the any occupation standard, Lincoln had to determine whether Jansen was "unable to perform each of

---

[14]One district court, when interpreting a definition of "total disability" similar to the definition in this case, concluded that an insured is totally disabled under the any occupation standard if she is unable to perform the "Main Duties" of her pre-disability occupation. Ulsaker v. Lincoln Nat'l Life Ins. Co., No. 1:10-cv-1416 (AJT/TRJ), 2011 WL 4621030, at *6–8 (D. Va. Sept. 30, 2011). To arrive at this interpretation, the district court substituted the policy's definition of "Main Duties"—meaning "those job tasks that [1] are normally required to perform the Insured Employee's Own Occupation, and [2] could not reasonably be modified or omitted"—for the phrase "Main Duties of any occupation" that appeared in the policy's any occupation standard. Id. Here, the Plan contains a definition of "Main Duties" similar to that in Ulsaker. Nevertheless, Jansen has not argued that the Plan's definition of "Main Duties" is inconsistent with Lincoln's interpretation of the any occupation standard, and this Court does not decide that issue.

21

the main duties of any gainful occupation which . . . her training, education or experience will reasonably allow." By the time Lincoln sought the opinions of Dr. Marhamati, Dr. Rosen, and Dr. Esguerra, a vocational analyst had opined that Jansen had the potential to work as a nurse consultant and a nurse registry director, both of which are classified as sedentary positions. Consistent with the vocational analysis, Lincoln requested Dr. Marhamati, Dr. Rosen, and Dr. Esguerra to review Jansen's medical records and determine whether she had limitations that would prevent her from performing any sedentary occupation. Doc. 24-2 at ¶ 10; Doc. 37 at ¶ 10; Doc. 28-2 at 13–15, 120, 121, 123, 155–61, 350–53, 355, 360. Lincoln also asked Dr. Marhamati, Dr. Rosen, and Dr. Esguerra to state their findings from the medical records, describe Jansen's impairments, and opine on whether the restrictions Jansen's treating physicians placed on her were reasonable. Doc. 28-2 at 13–15, 158–61, 165, 351–52, 360. Lincoln needed to know the extent of Jansen's impairments and limitations before it could decide whether she was unable to perform the main duties of certain occupations. Because the opinions of the reviewing doctors discussed Jansen's impairments and limitations, the opinions were relevant, despite the fact that they did not address whether Jansen could perform the main duties of a nurse consultant or a nurse registry manager. In any event, the ultimate issue in an ERISA case such as this is not whether the administrator could have asked the reviewing doctors more detailed or better questions, but whether substantial evidence supports the administrator's decision to terminate benefits. An administrator's decision must be affirmed when the record contains such evidence.

And here, the record did. With respect to Jansen's physical limitations, it is undisputed that by early 2012, she had recovered her cardiac function. Doc. 28 at ¶ 9; Doc. 31 at ¶ 3. Jansen's ejection fraction had returned to an appropriate level, and a stress test and

22

echocardiogram performed in May 2012 were normal. Doc. 28-2 at 180–81, 211, 219–24, 362–64. Dr. Greenhood, Dr. Marhamati, and Dr. Rosen agreed that Jansen had experienced a recovery, that her heart was functioning near normally, and that she no longer had cardiac-related limitations. Doc. 28-2 at 163–66, 350–53; Doc. 28-4 at 59–61. Even Dr. Hiltunen, Jansen's treating physician, agreed that there was "no objective evidence to suggest [Jansen] would have a physical limitation that would preclude her from working." Doc. 28-2 at 136. On this record, it was not an abuse of discretion for Lincoln to conclude that Jansen's heart issues did not prevent her from performing a sedentary occupation and in turn did not make her "unable to perform each of the main duties of any gainful occupation which . . . her training, education or experience will reasonably allow."

Nor was it an abuse of discretion for Lincoln to conclude that Jansen's bipolar disorder and anxiety disorder did not render her unable to perform certain sedentary work. To be sure, Lincoln's conclusion on this issue was not the only legitimate interpretation of the evidence; a reasonable person could accept the administrative record as adequate to support Jansen's position that her psychiatric conditions rendered her totally disabled under the Plan. Nevertheless, this Court's duty is to determine whether Lincoln's decision was supported by substantial evidence, not to substitute its own weighing of the evidence for that of Lincoln.

Jansen asserts that the opinions of her treating psychiatrists and Dr. Hiltunen establish that her mental illnesses rendered her totally disabled. To recap, Dr. Silas said that Jansen had a class three mental impairment and that she was totally disabled from her job and any other work, Doc. 28-3 at 408–09, Dr. Hiltunen said that Jansen's "overall medical condition, including her psychiatric problems," would preclude her from working as a nurse practitioner, Doc. 28-2 at 136, and Dr. Fuller said that she had a class four mental impairment and was unable to function

23

in competitive employment of any type during her symptomatic times, Doc. 28-2 at 139–40; Doc. 28-3 at 249–50. Although they certainly support Jansen's claim that she was totally disabled, the opinions of Jansen's treating physicians are only part of the administrative record.

The administrative record taken as a whole suggests that Dr. Fuller may have overstated Jansen's level of impairment. Dr. Fuller opined that Jansen's level of impairment in early 2013 was "actually greater" than her level of impairment in 2004 and 2005. Doc. 28-2 at 140. Yet a comparison of the treatment Jansen received during these two time periods undermines Dr. Fuller's opinion. Between 2004 and 2005, Jansen hospitalized herself three times for psychiatric conditions, Doc. 28-2 at 407–11, 434–36; Doc. 28-3 at 9–16, underwent electroconvulsive therapy, 28-2 at 419–28, and had twenty-two appointments with a psychiatrist, Doc. 28-3 at 87–88, 93–120. In contrast, Jansen's psychiatric treatment from 2011 to early 2013 was minimal. In fact, the only evidence in the administrative record concerning the treatment of Jansen's psychiatric conditions during this time period are Jansen's two appointments with Dr. Fuller in the summer of 2011 and her one appointment with Dr. Fuller in October 2012.[15] Although the notes from these three appointments show some fluctuation in Jansen's mental status examinations and the severity of her depression, they do not establish that Jansen's bipolar disorder precluded any employment for her. Indeed, when Jansen saw Dr. Fuller in July 2011, her mental status exam was within normal limits and she reported feeling "quite good." Doc. 28-3 at 255–57. Jansen's mood was "mildly depressed" at her August 2011 appointment with Dr. Fuller, but the remainder of her mental status examination was normal. Doc. 28-3 at 253–54.

---

[15]The attending physician's statement completed by Dr. Fuller for Jansen lists her last appointment with him as being in December of 2011. There are no notes from this December 2011 appointment (or any other appointment with Dr. Fuller beyond those listed above) in the 1,331 page administrative record. Nor has Jansen cited to any such notes in the record or added such notes to the record.

At the October 2012 appointment, Jansen was anxious, her concentration and focus were fair but "definitely diminished," and Dr. Fuller's diagnostic impression was that Jansen was "quite depressed." Doc. 28-2 at 173–74. However, the content of Jansen's thoughts was logical and coherent, her fund of knowledge was good, and her memory, abstract reasoning, and computation were intact. Doc. 28-2 at 173.

Second, Dr. Silas's conclusion that Jansen was totally disabled was based at least in part on Jansen's cardiac condition. See Doc. 28-3 at 409. A full understanding of Jansen's improved cardiac health, as explained above, supports a conclusion that her heart health did not prevent any gainful employment.

Third, Lincoln was under no obligation to afford the opinions of Jansen's treating physicians controlling weight under Eighth Circuit precedent. Rather, as long as substantial evidence supported its decision, Lincoln had the "discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians." Midgett v. Wash. Grp. Int'l Long Term Disability Plan, 561 F.3d 887, 897 (8th Cir. 2009) (quoting Dillard's Inc. v. Liberty Life Assurance Co. of Boston, 456 F.3d 894, 899–900 (8th Cir. 2006)). Here, Lincoln accepted the opinion of consulting psychiatrist Dr. Esguerra, who found "no clear descriptions of symptoms that would support active psychiatric impairments despite the diagnosis of bipolar disorder (type II) and anxiety." Doc. 28-2 at 161. In Dr. Esguerra's opinion, the records from Jansen's appointments with Dr. Fuller in 2011 revealed "a functional patient with minimal psychiatric symptoms. There were no records to indicate severity of psychiatric symptoms that would adversely affect function." Doc. 28-2 at 161. In light of Jansen's psychiatric treatment records, it was not an abuse of discretion for Lincoln to accept Dr. Esguerra's opinion and then to decide that Jansen's bipolar disorder and

anxiety did not cause her any functional limitations. Although reasonable minds could differ concerning how Jansen's psychiatric conditions affect her employability, this Court is not allowed to "weigh the evidence anew" in a case of this nature. Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1053 (8th Cir. 2011). Rather, when, as here, substantial evidence supports the administrator's decision, "it should not be disturbed even if a different, reasonable interpretation could have been made." McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 924 (8th Cir. 2004).

As set forth above, substantial evidence supports Lincoln's conclusions that Jansen's cardiac condition would not prevent her from performing a sedentary occupation and that her mental illnesses did not cause her any functional limitations. A remaining question then is whether Lincoln abused its discretion in determining that Jansen's training, education, or experience would reasonably allow her to perform the main duties of a gainful occupation performed at the sedentary level. For this question, Lincoln relied on the vocational assessment.

The vocational assessment listed Jansen as having a Master of Science degree in nursing and being certified as a nurse practitioner and an emergency room nurse. Doc. 28-3 at 201. Her work history includes jobs as a nurse practitioner, an occupational health nurse, and an emergency room nurse. Doc. 28-3 at 202. Based on Jansen's physical ability, education, and work history, the vocational analyst concluded that Jansen had several transferable skills that qualified her to perform other gainful occupations. Doc. 28-3 at 202–03. These jobs included work as a nurse consultant and a nurse registry director, both of which are defined as sedentary occupations. Doc. 28-3 at 202–03. The vocational assessment provided substantial evidence supporting Lincoln's decision that Jansen's training, education, and experience qualified her to perform the main duties of a nurse consultant and a nurse registry director. See Gerhardt v.

26

Liberty Life Assurance Co. of Bos., 736 F.3d 777, 781–82 (8th Cir. 2013) (finding no abuse of discretion where administrator relied on transferable skills analysis to conclude that plaintiff was reasonably fitted to perform certain occupation); Green, 646 F.3d at 1052 ("Transferable skills and labor market studies . . . can constitute substantial evidence supporting a denial of benefits."); Ferrari v. Teachers Ins. & Annuity Ass'n, 278 F.3d 801, 805, 808 (8th Cir. 2002) (relying in part on vocational assessment to conclude that insurer's decision to deny benefits was supported by substantial evidence).

Finally, although Lincoln's dual role as insurer and administrator of the Plan created a conflict of interest, this alone is insufficient to find that Lincoln abused its discretion. "In weighing a conflict of interest together with other factors, 'any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tie-breaking factor's inherent or case-specific importance.'" Hankins v. Standard Ins. Co., 677 F.3d 830, 837 (8th Cir. 2012) (quoting Metro. Life Ins. Co., 554 U.S. at 117). The factors in this case were not so closely balanced that Lincoln's conflict of interest becomes determinative. See id.

In sum, there are no disputed material facts, Lincoln's interpretation of the Plan was reasonable, and substantial evidence exists supporting Lincoln's decision that Jansen was not "unable to perform each of the main duties of any gainful occupation which . . . her training, education or experience will reasonably allow." Accordingly, Lincoln is entitled to judgment as a matter of law.

## III. CONCLUSION

For the reasons explained above, it is hereby

27

ORDERED that Defendants' Motion for Summary Judgment, Doc. 22, is granted. It is further

ORDERED that Plaintiff's Motion for Summary Judgment, Doc. 24, is denied.

DATED this 14th day of August, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE